(53 South. 863.)

No. 18,192.

CITY OF SHREVEPORT v. SHREVEPORT TRACTION CO.

(Nov. 28, 1910. Rehearing Denied Jan. 3, 1911.)

*(Syllabus by the Court.)*

1. MUNICIPAL CORPORATIONS (§ 376*)—CONTRACTS—OBLIGATIONS OF SUBCONTRACTOR.

It cannot be deduced, from the adjudged cases or from any other premise, that in the case of a contract with a municipality, which, though authorized or evidenced by an ordinance, involves mere conventional obligations, and does not involve the exercise by the municipality of its lawmaking power, a subcontractor can be held to have assumed the obligations of the contractor.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 376.*]

2. CONSTITUTIONAL LAW (§ 133*)—TRANSFERS—DUTY TO GRANT.

The obligation to grant universal transfers could be imposed on a street railway company by the city of Shreveport only as a matter of contract; and as the defendant has not, either expressly or impliedly, given its consent to such contract, it cannot be compelled to grant the transfers.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 133.*]

Appeal from First Judicial District Court, Parish of Caddo; A. J. Murff, Judge.

Action by the City of Shreveport against the Shreveport Traction Company. Judgment for defendant, and plaintiff appeals. Affirmed.

F. J. Looney, W. H. Scheen, and L. C. Butler, for appellant. Wise, Randolph & Rendall, for appellee.

Statement of the Case.

MONROE, J. Plaintiff seeks, in this proceeding, to compel defendant to—

"issue universal transfers to all passengers applying for the same, on one fare of five cents and without extra charge of any kind, on all lines owned and operated by it in the city of Shreveport, * * * which run without 320 feet of each other, and to establish reasonable and proper transfer stations for all of its said lines," etc.

The facts upon which the demand is predicated are as follows:

In November, 1906, the Gladstone Realty Company, as the owner of a tract of land known then, or later, as "Gladstone Park," lying a mile or more outside the limits of the city of Shreveport, conceived the idea of developing it as a place of amusement, and (as a necessary step in that direction) of connecting it with the city by a street railway. Its principal officers, Messrs. Atkins, were accordingly authorized to negotiate with the defendant company, which was operating the various street railway lines in Shreveport, with a view to the accomplishment of that object, and they did so negotiate, in the spring of 1907, and thereafter, with the result that, on March 16, 1908, a contract was entered into between the Gladstone Realty Company and the Shreveport Traction Company, containing the following, among other, stipulations, viz.:

The traction company agreed to operate a car over the track (to be thereafter laid) of the realty company, say from the corner of Herndon avenue and Creswell street (the terminus of the traction company's Highland Park line) down Herndon avenue to White street, and out White street to Gladstone Park (or to the Centenary College building, which, as we infer, is near the park); the realty company to pay for that service and for the maintenance of its track and trolley $15 per day.

Inasmuch, however, as the average daily receipts on defendant's Highland Park line were $36.75 a day, and passengers were to travel for the same fare on both lines, it was further agreed that from the gross receipts the traction company should deduct that amount, and that the receipts in excess thereof should be divided between the two companies in the proportions of two-thirds to the traction company and one-third to the realty company.

"In other words," reads the contract, "the Gladstone Realty Company is to receive one-third of the total receipts from through operations—Court House Square to, or near, Centenary College—over and over $36.75 per day. Should the joint operations of the two cars, over the lines of the Highland Park track and the Gladstone Realty track, not aggregate $36.75 daily, then the Gladstone Realty Company agrees to pay to the Shreveport Traction Company a sum sufficient to maintain said daily average."

It was further agreed that the realty company should ditch and drain its roadbed, string its span wires with insulators, establish a grade within certain limits, establish grade crossings, lay its tracks in the middle of the streets, that the feed wire to be installed by it should be of a certain voltage capacity, that needed switches should be constructed at its expense, that the $15 a day should be paid before the 10th of each month, that the books of the traction company (relating to the business in question) should be open to the realty company, that the traction company should have the right to alter the schedule of cars running over its own tracks as business or circumstances might require, that the car to be operated by the traction company for the realty company should be of a certain kind and operated between certain hours by crews to be under the supervision of and paid by the traction company, and that the right of the traction company to discontinue the service over the line of the realty company, in the event of the nonpayment of its monthly bills, should be reserved. The last of the stipulations reads:

"This contract to remain in full force and effect for a period of two years from the date hereof."

The contract was subsequently amended by agreement, but the amendment need not here be considered. At the date at which said contract was signed (March 16, 1908) there was in existence an ordinance of the city of Shreveport, which had been passed some three days before (on March 13, 1908), and which grants to John Lorenz (who is conceded to have represented the Gladstone Realty Company in the matter), "his heirs, successors, and assigns," the right to maintain a street railway on Herndon avenue from Creswell to White street, and thence on White street to Olive—in other words, on the streets connecting defendant's Highland Park line terminus with Gladstone Park. The grant is for 30 years and the ordinance imposes various conditions, and, among others, the following, to wit:

"The fare on said line shall be five (5) cents per passenger, from the end of the line, at Gladstone Park, to any point on Texas street, between McNeil and Market streets, the cars of said grantee to be operated from the intersection of Herndon avenue and Creswell street, toward Texas street, over the track of any street car line franchise holder, and the said grantee hereby guarantees the above service to the said Texas street; otherwise, this franchise shall, ipso facto, become null and void: Provided, said service be not prevented by fortuitous events or by bona fide suits, showing an involuntary suspension of said service on the part of said grantee. * * * Should the present or future holder of this franchise sell, set over, or otherwise dispose of this franchise to the holder of any other street railway franchise obtained from this city, or should acquire any such franchise from the latter, whose street car line, or lines, shall run within 320 feet of the street car line, the franchise of which is presently granted, or should any such other franchise holder acquire the right, by expropriation or otherwise, to operate over the street car line, the franchise of which is herein granted, then, and in any of these events, universal transfers, on one fare of five cents, and without extra charge of any kind, shall, instantaneously, be given on all lines operated by such franchise holders in any and all portions of the city where said lines run within 320 feet of each other, and reasonable and proper transfer stations shall be established."

And there are other provisions, which do not bear upon the question here at issue.

According to the testimony of the president and several of the officers of the traction company and of the president of the realty company, the particular terms of the franchise which the realty company was to obtain were not discussed in the negotiations which led to the contract between the two companies. All parties, no doubt, knew that it would be necessary for the realty company to get franchises from both the city and the parish as a condition precedent to any binding contract with reference to the establishment of the proposed railway, and the officers of the traction company without concerning themselves as to the terms of such franchises, seem to have assumed that the franchises would be obtained, and that they would authorize the contract into which, for their company, they entered, or, if it should not, that the matter was one for the realty company, and not the traction company, to concern itself about. Those officers testify, most positively, that they knew absolutely nothing about the provision in the city ordinance concerning transfers (which we have quoted), and that when, in the course of the negotiations which led to the contract between the two companies, the president of the realty company proposed that transfers should be given, the president of the traction company declined to hear him or to consider the proposition for a moment; and in that they are corroborated by the president of the realty company. As a matter of fact, the railway line in question was built by, or under the supervision of, officers of the traction company (acting, however, for the time, as employés of the realty company which was to, and did, foot the bill), and was put in operation in July, 1908, and was so continued, under the contract in question, without objection or action, on the part of the city of Shreveport, until October 19,

1909, when the city council passed a resolution instructing the city attorney to bring a suit such as this, and the suit was brought on November 26th following. Thereafter the council passed another resolution, directing that the suit be "withdrawn," and a motion to that effect was filed on behalf of the city on December 8th. The suit had, however, originally been brought in the name of the city of Shreveport and of "S. A. Dickson, Mayor," and the mayor continued to prosecute it, and has brought it before this court on appeal from an adverse judgment.

## Opinion.

The authority of the mayor, in view of the adverse action of the city council to prosecute this suit, is not here challenged by the defendant, and we shall express no opinion concerning it.

Upon the merits, we are unable to discover in what way the traction company became bound for the obligation here sought to be enforced. It was no party to the contract between the city of Shreveport and the realty company, did not know (its officers say) and was not bound to know that it contained the stipulation here involved, and as between it and the realty company (with which it alone contracted) it categorically refused to assume such an obligation.

No doubt there are cases where a municipal ordinance may operate at once as the evidence of a contract, and as a law, as where, in granting to a railway company a right of way over public property, the municipality exercises the lawmaking power conferred upon it for the protection of human life, by requiring that the railway tracks shall be fenced, and it is not uncommon to require that a street railway company shall keep the streets through which its lines pass in a safe condition; and the Supreme Court of the United States has held, with reference to an ordinance such as that first mentioned, that it was not merely a contract, but was also a municipal regulation, which, being authorized by the Legislature, had the force of law, and upon that basis sustained a right of action against a company, running its trains over the tracks of the original grantee, for the recovery of damages for personal injuries sustained by a child by reason of the absence of the required fence. On the other hand, whilst this court has held a street railway company liable in damages, under an ordinance such as that last mentioned, for injuries sustained by an individual in consequence of the unsafe condition of the street which the company had contracted to keep in order, the decision is based upon the implied liability of the company, resulting from its use of the street, under its contract, for its own purposes, and, as between it and the municipality, its assumption of the latter's obligation to keep the street in a safe condition. Cline v. Railroad Co., 43 La. Ann. 327, 9 South. 122, 26 Am. St. Rep. 187; Mahnke v. Railroad Co., 104 La. 411, 29 South. 52. And in other cases it has been held that the obligation of the railway company (to keep the street in order), being purely contractual, could not be enforced by mandamus. State ex rel. New Orleans v. Railroad Co., 37 La. Ann. 589.

It cannot, however, be deduced from the decisions mentioned, or from any other premises known to us, that, in the case of a contract with a municipality, which, though authorized or evidenced by an ordinance, involves mere conventional obligations, and does not involve the exercise by the municipality of the lawmaking power, a subcontractor can be held to have assumed the obligations of the contractor.

As to the obligation here sought to be enforced, the city of Shreveport could not impose it upon any one save with his consent and as a matter of contract, express or implied.

The defendant has given no express con-

sent that it shall be imposed on it. To the contrary, in a case lately decided, it appeared that the city of Shreveport attempted to compel defendant to grant universal transfers, and was enjoined from enforcing an ordinance to that effect, and the injunction was maintained by this court. Shreveport Traction Co. v. City of Shreveport, 122 La. 1, 47 South. 40, 129 Am. St. Rep. 345. Nor can it reasonably be said that it has impliedly consented to assume such obligation by reason of its dealings with the realty company, since its officers, in negotiating the contract with that company, distinctly refused to consider such a proposition. We therefore conclude that the position of the plaintiff is not well taken, and that his demand was properly rejected by the district court. We may say, in conclusion, that, as the contract between the defendant and realty company expired in July, 1910, and (as we are informed, through the brief filed on behalf of defendant) has not been renewed, the question here presented seems rather academic than otherwise, since it could hardly be contended, in any event, that defendant could be compelled to grant transfers under a contract, whether express or implied, which no longer exists.

Judgment affirmed.