CITY OF SHREVEPORT v. SOUTHWESTERN GAS & ELECTRIC CO.

(District Court, W. D. Louisiana. May 10, 1919.)

No. 7.

1. GAS ☞14(2)—NATURAL GAS—FRANCHISE—RIGHT TO INCREASE RATES.
   "Pine Island," so called, held within the "Caddo gas field," or "fields," so that, gas wells existing on the island of sufficient pressure to bring the gas to plaintiff city, the contingency on which defendant gas company bases its right to increase rates under a franchise did not exist.

2. ESTOPPEL ☞62(8)—IN PAIS—INCREASE IN RATES BY GAS COMPANY—LACK OF PROTEST ON NOTICE.
   Plaintiff city, when notified by defendant gas company that, as it was necessary to use pumps to force gas into the city, it would cease to operate under its amended franchise, but would continue to operate under the original franchise, by reason of having made no protest or objection, held not estopped to contest the gas company's right to increase rates, on the ground that the contingency specified in the franchise, nonexistence of sufficient pressure to bring the gas to the city without pumping, had come to exist; the notice having stated no increase in rates would be made.

3. ESTOPPEL ☞25—ESTOPPEL BY DEED—ASSIGNMENT OF FRANCHISE—CITY AS PARTY.
   A city, which, by providing the terms under which a franchise might be transferred from one gas company to another, consented in advance to the transfer under the terms stipulated, cannot be said to be a stranger to the assignment of the franchise, to bring it within the rule that strangers to a deed cannot avail themselves of estoppel arising therefrom.

4. GAS ☞6—FRANCHISE—RIGHTS ACQUIRED BY ASSIGNEE.
   Even in the absence of a specific provision in a gas franchise, its assignee can acquire no greater rights than the assignor, and he is bound to the city which granted the franchise by all the assignor's obligations, and may even be restricted in rights enjoyed under another franchise, where the franchise assigned to him so provides.

5. GAS ☞14(2)—FRANCHISE—RATES—ASSIGNMENT.
   A gas company, which had a franchise from the city, and thereafter acquired by assignment another franchise, can be held to the more favorable rate specified for manufacturers in the original franchise, and to the

more favorable rate for domestic consumers under the assigned franchise, which provided that, in the event of its assignment to any corporation holding a gas franchise from the city, the corporation should operate under the franchise providing the more beneficial and cheaper rate to the city and its inhabitants, even though a higher domestic rate might have been authorized under the original franchise.

In Equity. Suit by the City of Shreveport against the Southwestern Gas & Electric Company. Decree directed, perpetuating preliminary injunction.

B. F. Roberts, City Atty., Foster, Looney & Wilkinson, and Lewell C. Butler, all of Shreveport, La., for plaintiff.

Alexander & Wilkinson and C. H. Lewis, all of Shreveport, La., for defendant.

J. C. Pugh, Jr., of Shreveport, La., for intervener.

JACK, District Judge. The city of Shreveport brings this suit to restrain the defendant gas company from putting into effect an increase in its rates for natural gas. The Shreveport Creosoting Company and the Louisiana Cotton Oil Company have intervened, joining the city in its prayer for an injunction. A preliminary injunction was issued, and the case is now before the court on its merits.

The defendant gas company is the holder of, and is operating under, two franchises to supply the city with natural gas; the first granted in 1905 to the Citizens' Oil & Pipe Line Company, and the second granted in 1907 to J. B. and W. S. Atkins. The former, by various assignments, finally passed to the defendant company, and thereafter the latter, in 1909, was transferred to defendant by the Louisiana Gas Company, assignee of J. B. and W. S. Atkins, by a contract in which the Louisiana Gas Company sold to the defendant company its distributing system in the city of Shreveport and leased to it its franchise. Each of these franchises provides a maximum rate which may be charged, and each contains a proviso under which these rates may be increased. While the city alleges, and the defendant denies, that the proposed increase in rates is unfair and unreasonable, the issue before the court is not the fairness or unreasonableness of the proposed rates, but whether, under the terms of the contracts, the defendant has the right to increase them, and whether the contingency named in the franchises which would authorize the increased rates has arisen. In interpreting these franchises, and determining the intent of the parties at the time they were granted, it is well to consider briefly their history, as shown by the ordinances filed in evidence.

Shortly after the discovery of natural gas north of the city of Shreveport, in Caddo parish, a franchise was granted the Citizens' Oil & Pipe Line Company to supply the city and its inhabitants natural gas, which franchise contained the stipulation that the company should not charge exceeding 50 cents per 1,000 cubic feet, less a discount of 10 per cent. on bills paid prior to the 10th of each month.

Two years after the granting of the franchise to the Citizens' Oil & Pipe Line Company, J. B. and W. S. Atkins applied for and obtained from the city council a similar franchise, which contained, however, a

provision for a cheaper rate—for domestic consumption, not to exceed 25 cents per 1,000 feet, less the same 10 per cent, discount.

While the Atkins franchise was pending, the council was presented a proposed ordinance by the Shreveport Gas, Electric Light & Power Company, defendant gas company's predecessor, providing a reduction in the maximum rate which might be charged by the latter company for natural gas. Both ordinances were passed through their first reading May 21, 1907, and both at a subsequent meeting finally adopted. In this ordinance, amending the original franchise to the Citizens' Oil & Pipe Line Company, the maximum rate for domestic consumption was cut from 50 to 25 cents, with the same discount, 20 cents per 1,000 for public institutions, with a 10 per cent. discount, and 11 cents per 1,000 for manufacturers, less a 30 per cent. discount, up to 20,-000,000 cubic feet per month, and with a sliding scale for gas in excess of that amount.

This proposal by defendant company to reduce its rates was, as alleged in the answer, without any consideration whatever from the city. The motive, however, was apparent; the evident purpose being to discourage J. B. and W. S. Atkins, if possible, in the construction of their proposed line, and thus keep down competition. The domestic rate of the Atkins franchise was met, and a special rate was provided for manufacturers. Of course, this might have been done by the company without an amendment to its franchise; but by putting it in this form the company's prospective competitors were given notice that the new rates would be permanent, subject only to the contingency to which allusion has heretofore been made.

In the Atkins franchise there was a proviso that the maximum charge should be 50 cents per 1,000 cubic feet, whenever it should become necessary "to erect and maintain pumping stations to supply gas as required or authorized by this ordinance." In the amendment to the Citizens' Oil & Pipe Line Company franchise it was provided that the rates as therein fixed "shall remain in force and effect as long as what is now known as the Caddo gas field shall furnish gas in sufficient quantities with natural pressure sufficient to force such gas from the gas wells through the pipe line of the company to the city of Shreveport, but should the supply of gas or the natural pressure diminish, so as to make it necessary to use artificial force or power either to pump the gas from the wells or to force it through the pipe line of the company to the city of Shreveport, this amendment shall cease, and the rates hereby fixed shall become inoperative and void, and the rates now authorized to be charged by said company as fixed in said franchise shall revive and become executory, as if this amendment had never been passed, and in such event the said company shall be empowered and authorized to charge such rates as now fixed in its said franchise."

It will be noted that the contingency covered in the proviso of the amendment to the Citizens' Oil & Pipe Line Company franchise was such depletion of the Caddo gas field, as then known, as would necessitate the pumping of the gas to Shreveport, whereas in the Atkins franchise the Caddo gas field is not mentioned in the proviso, thus leaving

it inoperative, and the original rates in effect, so long as gas may be delivered in Shreveport by its own pressure, regardless of the location of the wells.

Later, however, in the Atkins franchise and in another connection, the Caddo gas fields are mentioned. In section 10 it is provided that work on the pipe lines shall begin within 60 days after passage of the ordinance, and that the grantee "shall furnish gas within 12 months from construction of pipe line from their gas wells located in and about the Caddo gas fields." Then follows the clause:

"The use of the term 'Caddo gas fields' shall embrace the Ananias gas field, the Pine Island gas field, and all other neighboring fields that are or may hereafter be developed by said grantees, their heirs, successors, or assigns."

In May, 1915, defendant company gave notice in writing to the city that, it having become necessary to use artificial means to force gas through its pipe line from the Caddo field to the city of Shreveport, as contemplated in its amended franchise, it would cease from that date to operate under such amendment, and would operate under the original franchise. The letter further stated, however, that there was no present intention on the part of the company to increase existing rates, but that the notice was given to preserve the company's legal right to do so.

In 1916 gas was discovered at Cedar Grove, 5 miles south of Shreveport, and was piped to the city by defendant company. About a year later a large gas field was discovered at Elm Grove, about 18 miles south of Shreveport. All the gas now used in Shreveport is piped from Cedar Grove and Elm Grove under its own pressure, without the use of pumps.

### Opinion.

First, I will consider the rights of the defendant under its first acquired franchise, that granted the Citizens' Oil & Pipe Line Company. It is evident that neither the Cedar Grove nor the Elm Grove districts, developed after the amendment to the franchise, can be considered as a part of the Caddo gas field as it was then known. The evidence conclusively shows that the wells originally drilled in the Caddo field, as shown on the map filed in evidence, have been so reduced in both volume and pressure as to make it impossible to supply the city from such wells. It is contended, however, that recent developments have shown that on Pine Island there is gas of sufficient volume and pressure to supply the city without the use of pumps. One witness, Mr. Todd, testifies that he is familiar with four wells on Pine Island which have a rock pressure of about 700 or 800 pounds, sufficient to force the gas to Shreveport. To about the same effect is the testimony of Mr. Osborn, who is connected with the gas department of the Standard Oil Company. One of these wells came in 6 or 8 months ago with a capacity of 18,000,000 feet a day. Its present capacity is some less. The defendant offered no testimony whatever as to the volume or pressure of the wells on Pine Island, choosing, it would appear, rather to stand on the position that Pine Island was not a part of the Caddo field, as known at the time of the amendment to its franchise.

Should, then, Pine Island be considered a part of the Caddo gas field, as it was known at the time of the amendment to the Citizens' Oil & Pipe Line franchise? As shown by the map filed in evidence, there was at that time a group of 7 or 8 wells in the immediate vicinity of Caddo City, a little station on the Kansas City Southern road about 22 miles north of Shreveport, and there was within a radius of 3 miles a larger group in the vicinity of Ananias, or Oil City, another station on the same line about three-quarters of a mile nearer Shreveport, and there was one well on Pine Island, about a mile from the nearest of the group about Caddo City. The entire territory covered by all of these wells, the city contends, constituted what was then known as the Caddo gas field; while the defendant contends that these groups constituted several distinct fields, and that only those wells in the immediate vicinity of Ananias, or Oil City, and Caddo City, were in the Caddo field, as then known. As before stated, in the Atkins franchise, the term "Caddo gas fields" was specifically stated to include Pine Island. It is true that, in the Atkins franchise, the term is "Caddo gas fields," plural; whereas, in the Citizens' Oil & Pipe Line franchise, the term is "Caddo gas field," singular. I think, however, there is no distinction to be made in the words "fields" and "field," as used in the franchises, but that they were used just as the terms "lands" and "land" are indifferently used. It is clear, then, that in the Atkins franchise the city considered Pine Island in the Caddo gas field, and there is no good reason to presume a different understanding on the part of the city in the amendment to the Citizens' Oil & Pipe Line Company franchise. Furthermore, it is but reasonable to conclude that such was the intention of the defendant, who, under the circumstances, must necessarily be presumed to have been fully familiar with the Atkins franchise. This amendment was presented to the council by the defendant company's manager, and, if he did not intend to accept the definition of "Caddo gas fields" as contained in the Atkins franchise, he should have so stated. The only restriction he made in the term was to limit it to what was then known as the "Caddo gas field," thus providing against the inclusion in the future of some unanticipated field, such, for instance, as Cedar Grove, but not negativing the inclusion of the neighboring area, on which oil had already been found and which was specifically included in the term "Caddo gas fields" in the contemporaneous Atkins franchise.

[1] I am of the opinion that Pine Island was at the time, as testified by several witnesses, understood and considered a part of the Caddo gas field, and that, as the evidence shows gas wells now exist on Pine Island of sufficient pressure to bring the gas to Shreveport, the contingency on which defendant bases its right to increase its rates has not been established.

[2] The city is not estopped by reason of having made no protest or objection in 1915, when notice was given by the defendant company that, inasmuch as it was then necessary to use pumps to force the gas to Shreveport, it would cease to operate under its amended franchise, but would continue to operate under its original franchise. As the notice stated that no increase in rates would be made, it was a matter

of no material concern to the city. It is not claimed that the defendant was in any wise injured by such failure of the city to protest, or that it thereby was induced to take a different course to its detriment.

Defendant's right to increase its rates is to be measured, not only by the original Citizens' Oil & Pipe Line Company franchise and the amendment thereto, but likewise by the terms of the Atkins franchise. The rate fixed in the latter is more favorable to the domestic consumer, though it does not contain the reduced special rate to the manufacturer, and, as before pointed out, this rate may not be increased so long as the gas is piped into the city under its own pressure. Whether the gas be brought from the original field or another is immaterial.

In 1909 the Louisiana Gas Company, holder of the Atkins franchise, sold its entire distributing system in the city of Shreveport, but not its wells or pipe line, to the defendant company, and "leased" to it its franchise for a period terminating on the date of the expiration of such franchise. The contract was in effect one of partnership, by which the two companies pooled their interests and consolidated their business; the defendant company taking exclusive charge of the sale and distribution of the gas in the city, and both companies jointly continuing to furnish the required gas from their respective wells. The Louisiana Company agreed to furnish 40 per cent. of the gas and the defendant the remaining 60 per cent.; the Louisiana Company to pay $400 per month as its portion of the operating expenses in the city of Shreveport, and to receive as its part of the profits 40 per cent. of the gross receipts. The defendant company specifically bound itself not to charge for gas a rate in excess of the rate authorized in the Atkins franchise.

Furthermore, the Atkins franchise contained a provision that, in the event it should be assigned or transferred to any person or corporation holding a gas franchise from the city, such party should operate under that one of such franchises providing the more beneficial and cheaper rate to the city and its inhabitants. The city contends that, by acquiring the Atkins franchise, the defendant company became bound by its terms, and is now estopped to claim any right, if any it had, under its first-acquired franchise, to increase its rates over those provided in the Atkins franchise.

[3, 4] In answer, counsel for defendant cite a number of cases holding that strangers to a deed cannot avail themselves of an estoppel arising therefrom. This is a well-established principle of law, but it has no application to the assignment of a franchise. Were the law otherwise, the Louisiana Gas Company, by this arrangement with the defendant company, might receive indirectly from consumers a larger price for its gas than it could have collected directly from them under the terms of its franchise. The city provided the terms under which the franchise might be transferred, and thus in advance consented to such transfer under the terms stipulated. It therefore cannot be said to be a stranger to the assignment. The assignment could be made only under the conditions provided. Even in the absence of such specific provision in the franchise, an assignee can acquire no greater rights than his assignor, and he is bound to the city by all of the ob-

ligations of the latter. He may even restrict rights enjoyed under another franchise, where the last-acquired franchise so provides.

In the case of Shreveport v. Shreveport Traction Co., 127 La. 560, 53 South. 863, cited by counsel for defendant, the city had granted to one Lorenz a franchise to operate a street railroad, with the stipulation that, should such franchise be assigned to a company operating another street railroad in the city, transfers should be issued over both lines. The defendant traction company had not purchased or otherwise acquired the Lorenz franchise, but had entered into a contract to operate for Lorenz or his successor cars over such line for a certain definite time which had expired. The testimony showed that the traction company was ignorant of this transfer stipulation in the Lorenz franchise, and had expressly refused to agree to include such a provision in its contract. The court held that the traction company was a subcontractor, and not bound by such agreement between the city and Lorenz, adding, in its conclusion, that the question was rather academic, "since it could hardly be contended, in any event, that defendant could be compelled to grant transfers under a contract, whether express or implied, which no longer exists." The case has no application to the case at bar, in which the defendant is not a subcontractor, but is the assignee of the franchise in question, and does not claim to have been ignorant of its provisions. Hand in hand with the privileges of a franchise must go its reciprocal obligations to the public.

[5] The defendant may, I conclude, be held to the more favorable rate given the manufacturer in the Citizens' Oil & Pipe Line Company franchise, and to the rate made domestic consumers in the Atkins franchise, even though a higher domestic rate might have been authorized under the former. If two franchises, acquired by assignment and operated under by one company, provide different rates, there is no good reason why the company should have the right to demand the higher rate rather than that the city should have the right to demand the lower, and there is certainly no good reason why the city should not demand the rates under the more favorable franchise, when it is so specifically provided in the franchise last acquired by the operating company.

For the foregoing reasons, and in accordance with the views herein expressed, a decree will be entered, perpetuating the preliminary injunction heretofore issued.